FILED

2014 Oct-07  PM 01:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| EMCASCO INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-12-S-1890-NW |
| | ) | |
| KELLI KNIGHT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### AMENDED MEMORANDUM OPINION AND ORDERS
(Entered October 7, 2014 *nunc pro tunc* August 22, 2014)

It is ORDERED that the Memorandum Opinion and Order filed in this action

on August 22, 2014, and entered as document number 47 be, and the same hereby is,

rescinded and withdrawn, and the following substituted in its place.

========================================================

Eleven claims have been asserted in this action.  Six of those were framed in

the complaint of plaintiff (and counterclaim-defendant), EMCASCO Insurance

Company ("EMCASCO"), which requests, under six remedial theories, that this court

enter a judgment declaring that EMCASCO had no obligation under homeowner's

insurance policy number 74S-44-04-12 to provide defendants (and counterclaim-

plaintiffs), Christopher and Kelli Knight, with coverage for a house fire that occurred

1

on December 4, 2011, at 919 Vista Circle in Tuscumbia, Alabama.[1]

The remaining five claims were asserted in the Amended Counterclaim of Christopher and Kelli Knight.[2]  EMCASCO has moved for summary judgment on all of those counterclaims.[3]

Count One of the Knights' amended counterclaim alleges that EMCASCO breached its contractual obligations under the Knights' homeowner's policy by "failing and refusing to tender payment of any and/or all available proceeds as set out in its contract or policy of insurance applicable to the dwelling and contents."[4]

Count Two of the Knights' amended counterclaim contends that EMCASCO breached its fiduciary duties of good faith and fair dealing under the terms of that policy by:

> (*i*)   "refusing to pay benefits set out in the policy, where there existed no lawful basis for [EMCASCO's] refusal coupled with [EMCASCO's] actual knowledge of the absence of any lawful basis for their refusal to pay the benefits";

> (*ii*)   "intentionally failing to determine whether there was an arguable reason or lawful basis for denying payment of full benefits

---

[1] *See* doc. no. 1 (Complaint).  Plaintiff also requested that the court order the Knights to reimburse EMCASCO "for all moneys EMCASCO was caused to pay because of defendants' breach of contract and violation of Alabama statutory law." *Id.* at 13.

[2] *See* doc. no. 7 (Knights' Amended Counterclaim).

[3] Doc. no. 20 (Plaintiff's Motion for Summary Judgment).  EMCASCO has not moved for affirmative summary judgment on its original complaint seeking a declaratory judgment; thus, the merits of the original complaint are not presently before the court, and, thus, remain pending.

[4] *Id*. at 3.

under the policy and/or by failing to submit the results of any alleged investigation to a reasoned and informed evaluation and review before denying payment"; and,

(*iii*)   "consciously or deliberately engag[ing] in oppression, fraud, wantonness[,] or malice with regard to the Knights, thereby depriving the Knights of legal rights and entitling the Knights to punitive damages against EMC Insurance."[5]

Count Three of the Knights' amended counterclaim alleges that EMCASCO negligently, wantonly, and/or willfully failed "to properly document the known mortgagee on the Knights' policy," and "refused to make payment under the Mortgagee Clause[,] asserting that there was no mortgagee listed on the subject policy," even though EMCASCO "was aware through its employee(s), agent(s), and/or representative(s) that the Knights had a mortgage on their property with Regions Bank" ["Regions"].[6]

Finally, Counts Four and Five of the Knights' amended counterclaim rely upon the same operative facts as Count Three, but add separate allegations of fraud. Count Four, asserting a claim for "Fraudulent Misrepresentation," states that EMCASCO "made multiple representations to the Knights that the mortgagee would be properly documented on their policy," that those representations "were false and [EMCASCO] knew they were false; or [EMCASCO] recklessly misrepresented the facts, without

---

[5] *Id.* at 5–6 (alterations supplied).

[6] *Id.* at 7–8 (alteration supplied).

3

true knowledge thereof; or [EMCASCO] misrepresented the facts by mistake, but did so with the intention that the Knights should rely upon them."[7]  Count Five adds a claim of "Fraudulent Suppression," alleging that EMCASCO "had a duty to properly document the known mortgagee on the Knights' policy and suppressed the fact that the mortgagee would not be properly documented on their policy."[8]

This court has jurisdiction over the controversy pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different States and the amount in controversy exceeds $75,000.

## I.  STANDARDS FOR EVALUATING SUMMARY JUDGMENT MOTIONS

Summary judgment should be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact.  *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, Rule

---

[7] *Id.* at 9–11 (alterations supplied).

[8] Doc. no. 7 (Knights' Amended Counterclaim), at 12, 14.

56(c) requires the nonmoving party to go beyond the pleadings, and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, to designate specific facts showing that there is a genuine issue for trial. *See id.* at 324. Any reasonable dispute or doubt as to any material fact, and all justifiable inferences, are resolved in favor of the non-moving party. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The materiality of a fact is determined by the substantive law at issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A "genuine" dispute is one in which a reasonable jury could find for the non-moving party. *Id*.

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## II.  FACTS

The pertinent facts in this case arose from a fire that occurred on the evening of December 4, 2011, in a house located at 919 Vista Circle in Tuscumbia, Alabama. The structure was owned by defendants and counterclaim-plaintiffs, Christopher and Kelli Knight.[9]  EMCASCO Homeowner's Insurance Policy No. 74S-44-04-12 was in full force and effect on the date of the events that form the basis of the claims alleged in the underlying suit, and provided coverage to the Knights for fire and other insured perils.[10]

### A.   The Knights' Application for EMCASCO "Homeowners Special Form 3" Policy No. 74S-44-04-12

The Knights' application for homeowner's insurance with EMCASCO was rife with errors and omissions.  First, the Knights did not disclose that they had made a claim on a prior homeowner's policy following a fire at the same location on March 21, 2009.[11]  In fact, Andy Kabcenel, EMCASCO's Personal Lines Underwriting

---

[9] *Id.* ¶ 1.

[10] *See id.* ¶ 2.

[11] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 95 (citing doc. no. 22-6 (Plaintiff's Exhibit "J" (SIU Investigative Report #1)); doc. no. 25-2 (Plaintiff's Exhibit "W", Part 1 (Deposition of Nicole Creel)), at 52); *see also* doc. no. 25-5 (Plaintiff's Exhibit "W", Part 4), at ECF 13–14 (Homeowner's Insurance Application for Christopher and Kelli Knight, Dec. 29, 2010).  "ECF is the acronym for Electronic Case Filing, a filing system that allows parties to file and serve documents electronically."  *Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 allows citation "to page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D. D.C. 2011) (citing The Bluebook: A Uniform System of Citation R.B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds.,

Supervisor and the EMCASCO employee who ultimately wrote the insurance policy at issue in this action (although not the agent who met with the Knights and transcribed their information for their insurance application), learned after the Knights' 2011 fire that the Knights had made *three* previous insurance claims — a fact that would have made them ineligible for coverage with EMCASCO.[12]

Second, the Knights failed to disclose that they had filed for Chapter 7 Bankruptcy on March 28, 2008.[13]

Third, even though Regions held a mortgage on the insured property, no mortgagee was named on the application or on the subsequent homeowner's policy.[14]

---

19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[12] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 99 (citing doc. no. 25-7 (Plaintiff's Exhibit "X" (Affidavit of Andrew H. Kabcenel))); *see also* doc. no. 21-2 (Plaintiff's Exhibit "C" (Deposition of Charles Highland Herrold)), at 4 (explaining the corporate relationship between EMCASCO and its parent company, "EMC Insurance Companies").

[13] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶¶ 75, 107 (citing doc. no. 21-4 (Plaintiff's Exhibit "D", Part 2 (Voluntary Petition for Bankruptcy)), at 55–109); *see also* doc. no. 25-5 (Plaintiff's Exhibit "W", Part 4), at ECF 13–14 (Homeowner's Insurance Application for Christopher and Kelli Knight, Dec. 29, 2010).  Though paragraph 75 of EMCASCO's "Undisputed Statement of Facts" asserts that the Knights filed for Chapter 7 bankruptcy on March 28, *2009*, it is evident from the entirety of the record, including a copy of the bankruptcy petition itself, that the correct date is March 28, *2008*, and the date in paragraph 75 is considered to be a scrivener's error and not reasonably in dispute.

[14] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 100 (citing doc. no. 25-2 (Plaintiff's Exhibit "W", Part 1 (Deposition of Nicole Creel)), at 53); *see also* doc no. 1-1 (Plaintiff's Exhibit "A" (EMCASCO Insurance Company Policy Number 74S-44-04-12)), at ECF 4; doc. no. 25-5 (Plaintiff's Exhibit "W", Part 4), at ECF 13–14 (Homeowner's Insurance Application for Christopher and Kelli Knight, Dec. 29, 2010).

Finally, neither Christopher nor Kelli Knight signed the application.[15]

Even so, *none* of the errors or omissions in the application or subsequently issued policy were due to affirmative misrepresentations or omissions by the Knights themselves.[16] Instead, the person who prepared the policy application for the Knights, Nicole Creel, who was an independent insurance agent and not an EMCASCO employee,[17] made the following admissions in her deposition: she was aware of the Knights' prior fire loss claim but failed to disclose that information;[18] she did not ask the Knights whether they had previously filed for bankruptcy;[19] the Knights informed her of their mortgage with Regions, but she neglected to include that information on the application;[20] and, she prepared the application for the Knights, but failed to provide an opportunity for either of them to read and sign it before presentation to

---

[15] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶¶ 105–06 (citing doc. no. 25-2 (Plaintiff's Exhibit "W" (Deposition of Nicole Creel)), at 55, 58); *see also* doc. no. 25-5 (Plaintiff's Exhibit "W," Part 4), at ECF 13–14 (Homeowner's Insurance Application for Christopher and Kelli Knight, Dec. 29, 2010).

[16] *See, e.g.*, doc. no. 25-2 (Plaintiff's Exhibit "W," Part 1 (Deposition of Nicole Creel)), at 53, 97–98, 101.

[17] Creel, who was formerly known as Nicole Spurgeon, *see id.* at 7, was employed by Sinclair-Lawrence, an independent insurance agent who contracted with EMC to take and submit applications for EMC insurance policies and to bind coverage with EMC. *See* doc. no. 23-4 (Plaintiff's Exhibit "O" (Deposition Testimony of Jewel D. Stubbs)), at 20–21.

[18] *See* doc. no. 25-2 (Plaintiff's Exhibit "W," Part 1 (Deposition of Nicole Creel)), at 30–31.

[19] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 107 (citing doc. no. 25-2 (Plaintiff's Exhibit "W," Part 1 (Deposition of Nicole Creel)), at 51–52).

[20] *See id.* at ¶ 100 (citing doc. no. 25-2 (Plaintiff's Exhibit "W," Part 1 (Deposition of Nicole Creel)), at 53).

EMCASCO.[21]

**B**.     **Pertinent Provisions of the Knights' Insurance Policy**

EMCASCO issued Homeowner's Policy No. 74S-44-04-12 to Christopher and Kelli Knight on January 14, 2011.[22]   The homeowner's policy itself contained multiple definitions, exclusions, and conditions, including the following provisions pertinent to the present action:

**DEFINITIONS**

> **A.**     In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household.  "We", "us" and "our" refer to the Company providing this insurance.

> **B.**     In addition, certain words and phrases are defined as follows:

>> . . . .

>>> **5.**     "Insured" means:

>>>> **a.**     You and residents of your household who are:

>>>>> **(1)**     Your relatives; or

>>>>> **(2)**     Other persons under the age of 21 and in the care of any person named above;

---

[21] *See, e.g.*, doc. no. 25-2 (Plaintiff's Exhibit "W," Part 1 (Deposition of Nicole Creel)), at 54–55, 83, 88.

[22] Doc. no. 1-1 (Plaintiff's Exhibit "A" (EMCASCO Insurance Company Policy Number 74S-44-04-12)), at ECF 2.

**SECTION I — EXCLUSIONS**

      **A.**    We do not insure for loss caused directly or indirectly by any of the following. . . .

    . . . .

          **8.**    Intentional Loss

          Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

          In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

. . . .

      **Q.**    **Concealment Or Fraud**

      We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

          **1.**    Intentionally concealed or misrepresented any material fact or circumstance;

          **2.**    Engaged in fraudulent conduct; or

          **3.**    Made false statements;

      relating to this insurance.[23]

**C**.    **December 4, 2011 Fire**

---

[23] *Id.* at ECF 7, 18, 21–22.

10

On the date of the fire, eight persons resided at 919 Vista Circle in Tuscumbia, Alabama:  Christopher Knight; his wife, Kelli Knight; their son, Titus Knight (who then was nine years of age); their daughter, Laiken (who then was eight years of age); Jamie Forcier, a family friend, who occupied the basement; and Jamie Forcier's three children, who were seven, two, and seven months of age, respectively, on the date of the fire.[24]  In addition, the Knights owned two dogs that lived in the home.[25]

On the evening of the fire, Christopher and Kelli Knight, their two children, and one of their two dogs, along with Jamie Forcier and her three children, were across the street, visiting the home of Ms. Forcier's sister, Jana Silvia.[26]  Ms. Silvia's boyfriend and children were also present at the home.  At approximately 7:00 p.m., Christopher Knight stepped outside Ms. Silvia's residence in an attempt to obtain better reception for his cellular telephone, at which time he observed that the exterior Christmas lights on his home, which he had turned on before leaving the house, were no longer lit.[27]  After moving closer to the house, Christopher Knight heard fire alarms sounding within the house.  After discovering that the front door was locked,

---

[24] *See, e.g.*, doc. no. 21-2 (Plaintiff's Exhibit "C" (Deposition of Charles Highland Herrold)), at 55; doc. no. 21-3 (Plaintiff's Exhibit "D," Part 1 (Evers & Associates First Report)), at 2–3.

[25] *See, e.g.*, doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 14, 37, 58.

[26] *See, e.g.*, doc. no. 20-1 (Undisputed Statement of Facts) ¶¶ 18–19; *see also* doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 14, 37.

[27] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 20.

he kicked in the door and was greeted with heavy black smoke.[28]  Knight then ran to the back of the house to free his German Shepard, whom he believed to still be inside the house, at which time he discovered flames rising through the back window of the basement.[29]

Ms. Silvia's boyfriend reported the fire to the Tuscumbia Fire Department at 7:16 p.m.[30]  While waiting for the fire department to arrive, Christopher Knight managed to turn off the gas line to the home, but was unsuccessful in his attempts to use a water hose to fight the flames.[31]  The first firefighters arrived at the scene at 7:23 p.m., where they, like Christopher Knight, observed heavy smoke rising from the home and flames coming from the basement.[32]

The firefighters battled the blaze until 11:28 p.m., when the fire appeared to be fully extinguished.[33]  At or around that time, the Knights left the scene, and spent the

---

[28] *See id.*; *see also* doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 36.

[29] *See* Doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 36.

[30] *See id.* at 42; *see also* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 1 (citing doc. no. 21 (Plaintiff's Exhibit "A" (Tuscumbia Fire Department Incident Report))).

[31] *See* doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 42, 55.

[32] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 13; doc. no. 21 (Plaintiff's Exhibit "A" (Tuscumbia Fire Department Incident Report)).

[33] *See* doc. no. 21 (Plaintiff's Exhibit "A" (Tuscumbia Fire Department Incident Report)).; doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 56.

night at Kelli Knight's parents' home in Sheffield, Alabama.[34]  Kelli Knight informed EMCASCO of the fire loss by a telephone call placed at 1:08 a.m. on December 5, 2011.[35]

The next morning, the Knights were informed by Kelli Knight's father that the Fire Department had called his home between 2:30 and 3:00 a.m., and advised him that the fire had rekindled and caused considerable damage to the remaining structure.[36]

## D.   Insurance Claim and Subsequent Investigation

After receiving notification of the fire loss, EMCASCO retained Mickey Evers, an independent claims adjuster, to handle the Knights' claim.[37]  Evers was supervised by Jewel Stubbs, the Birmingham branch supervisor for EMCASCO, who was in turn advised and supervised by Charles Herrold, a property claims superintendent for Employers Mutual Casualty Company, the parent company of EMCASCO.[38]

---

[34] *See* doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 56.

[35] Doc. no. 20-1 (Undisputed Statement of Facts) ¶ 3 (citing doc. no. 21-1 (Plaintiff's Exhibit "B" (EMC Property Loss Notice, Dec. 5, 2011))).

[36] *See, e.g.*, doc. no. 21-3 (Plaintiff's Exhibit "D," Part 1 (Evers & Associates First Report & Exhibits)), at 5, 10.

[37] Doc. no. 20-1 (Undisputed Statement of Facts) ¶ 6.

[38] *See id.* ¶¶ 4–5; *see also* doc. no. 21-2 (Plaintiff's Exhibit "C" (Deposition of Charles Highland Herrold)), at 6–7.  EMCASCO is a subsidiary of Employers Mutual Casualty Company, which is known by the trade name "EMC" or "EMC Insurance Companies." *See, e.g.*, doc. no. 21-2 (Plaintiff's Exhibit "C" (Deposition of Charles Highland Herrold)), at 4.

Evers interviewed Kelli Knight, inspected and photographed the loss, drew a building diagram, reviewed the Knights' deed, examined reimbursement receipts presented by the Knights, reviewed photographs from an earlier fire at the same location, and prepared and presented five written reports detailing his work and findings to Stubbs and Herrold.[39]

EMCASCO also retained an independent fire investigation company, Southeastern Origin & Cause, to investigate the fire.[40] An employee of that company, Darwin Clark, conducted the investigation.[41] On the day after the fire, *i.e.*, December 5, 2011, Clark inspected the scene, took photographs, collected evidence, and conducted interviews with Christopher Knight and Tuscumbia Fire Chief David Cole.[42] Chief Cole showed Clark the basement apartment where Jamie Forcier and her three children had been residing, and the location in which Cole believed the fire had originated.[43] Christopher Knight told Clark that, even though he was unsure of the cause of the fire, he "thought Ms. Forcier might have left the heater on in the

---

[39] Doc. no. 20-1 (Undisputed Statement of Facts) ¶¶ 7–10.

[40] *Id.* ¶ 11

[41] *See id.*

[42] *See id.* ¶¶ 12, 14, 17; doc. no. 22 (Plaintiff's Exhibit "E" (Southeastern Origin & Cause Reports)), at 2–5.

[43] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 14; doc. no. 22 (Plaintiff's Exhibit "E" (Southeastern Origin & Cause Reports)), at 3.

downstairs apartment and it was too close to the mattress."[44]   Clark collected the heater as evidence.[45]

Clark returned to the scene of the fire on four subsequent occasions as part of his investigation.  On December 16, 2011, he removed debris from the upstairs area of the home with a track-hoe excavator, in order to better access the basement.[46]  The following day, he photographed, removed, and examined a large portion of the debris in the basement area, and collected two laboratory samples for testing from the area around the large mattress that had been used by Jamie Forcier.  Clark did so because he determined that "an area of intense burning" had occurred in the area of the mattress.[47]  Subsequent laboratory testing revealed no presence of ignitable liquids in or around the mattress.[48]

Clark returned to the scene of the fire on December 22, 2011, this time with an electrical engineer, Dr. Ray Franco, who did not find any electrical failures or electrical heat sources for the fire.[49]

---

[44] Doc. no. 22 (Plaintiff's Exhibit "E" (Southeastern Origin & Cause Reports)), at 4; *see also* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 21.

[45] *E.g.*, doc. no. 22 (Plaintiff's Exhibit "E" (Southeastern Origin & Cause Reports)), at 4.

[46] *See id.* at 5.

[47] *See id.*

[48] *See id.*

[49] *See id.* at 5–6; *see also* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 27; doc. no. 22-4 (Plaintiff's Exhibit "H" (Affidavit of Dr. Ray Franco, P.E.)), at 3–4, 6.

Clark removed the remainder of the basement debris on December 30, 2011, and reconstructed the setting of the basement apartment with the assistance of Jamie Forcier.[50]

Finally, on January 16, 2012, an additional examination took place at the offices of Southeastern Origin & Cause, to test the hypothesis that the space heater found in the debris had provided the heat source for the fire.[51]  After three separate tests failed to ignite the bedding or mattress, Dr. Franco concluded that no electrical sources, including the space heater, could have caused the fire.[52]  Thus, Clark concluded that, although the large mattress in the basement apartment had been the origin of the fire, the cause of the fire was not electrical.[53]  Rather, Clark stated in his report that "[t]he cause of this fire is determined to be incendiary":  that is, the fire was intentionally set.[54]

### 1.   Prior insurance claims

In addition to Jewel Stubbs and Charles Herrold (who are identified in the second sentence of Section "D", *supra*), a third employee of Employers Mutual

---

[50] *See* doc. no. 22 (Plaintiff's Exhibit "E" (Southeastern Origin & Cause Reports)), at 4, 6.

[51] *See id.* at 6.

[52] *See* doc. no. 22-4 (Plaintiff's Exhibit "H" (Affidavit of Dr. Ray Franco, P.E.)), at 4–6.

[53] *See* doc. no. 22 (Plaintiff's Exhibit "E" (Southeastern Origin & Cause Reports)), at 6.

[54] *Id.*; *see also* doc. no. 23-4 (Plaintiff's Exhibit "O" (Deposition Testimony of Jewel D. Stubbs)), at 15 (defining "incendiary fire" as "a fire that is set with intent to do damage" and "an intentional fire") (alteration supplied).

Casualty Company ("EMC") was assigned to the Knights' claim:   Tim Pettit, a Special Investigations Unit investigator.[55]   Pettit's initial investigation, conducted on December 7, 2011, revealed information on Christopher and Kelli Knight that concerned Jewel Stubbs and Charles Herrold.[56]   For example, Pettit discovered that the couple had jointly filed for Chapter 7 bankruptcy on March 28, 2008, in Decatur, Alabama.[57]   Pettit also discovered four small claims judgments entered against Kelli Knight from 2006 to 2011, in amounts ranging from $310 to $1,487.[58]   Of most concern, however, was Pettit's discovery that the Knights had filed *seven insurance claims between 2009 and 2011*, including two claims for fire damage:   *i.e.*,

- September 4, 2011 claim with EMC for damage to the rear window and top of the Knights' car;

- June 25, 2011 claim with Progressive for damage caused when their boat struck an item in the water;

- April 3, 2011 claim with EMCASCO for fire damage to the Knights' house, resulting in a payment of $52,366 to the Knights;

- November 24, 2010 claim to EMC for vandalism damage to the Knights' car, resulting in a payment of $3,378;

---

[55] *See* doc. no. 21-2 (Plaintiff's Exhibit "C" (Deposition of Charles Highland Herrold)), at 28–29.

[56] *See id.* at 30–31.

[57] *See, e.g.*, doc. no. 22-6 (Plaintiff's Exhibit "J" (SIU Investigative Report #1)), at 1; *see also* doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 55–109.

[58] *See* doc. no. 22-6 (Plaintiff's Exhibit "J" (SIU Investigative Report #1)), at 1.

- October 27, 2010 claim to EMC for vandalism damage to the Knights' car, resulting in a payment of $4,442;

- August 27, 2009 commercial liability claim filed against an "Olive Garden" restaurant, based on the Knights' claim of finding glass shards in their food;

- March 21, 2009 claim to Cotton States Insurance for a property loss caused by a fire.[59]

In light of the Knights' 2008 bankruptcy, the April 2011 house fire, and their multiple insurance claims over the preceding three years, EMCASCO elected to proceed with the Knights' insurance claim under a reservation of rights, and retained separate legal counsel.[60]

### 2.    The Knights' alleged misrepresentations and behavior

Jewel Stubbs testified during her deposition that, other than the incendiary origin of the fire, the Knights' 2008 bankruptcy, and the seven undisclosed insurance claims listed above, three additional considerations contributed to EMCASCO's ultimate decision to deny the Knights' insurance claim.  They were:  Kelli Knight's aggressive behavior immediately after the fire loss; the misrepresented values of some

---

[59] Doc. no. 20-1 (Undisputed Statement of Facts) ¶ 38 (alteration supplied) (citing doc. no. 22-6 (Plaintiff's Exhibit "J" (SIU Investigation Report #1)), at 1–2).

[60] *See* doc. no. 21-2 (Plaintiff's Exhibit "C" (Deposition of Charles Highland Herrold)), at 29–31.  *But see* doc. no. 25-8 (Plaintiff's Exhibit "Y" (Affidavit of Jewel Stubbs)), at 2 (stating that the Knights' claim was handled under a reservation of rights "due to coverage questions that arose, including the experts' classification of the fire as incendiary; *and, because misrepresentations before and after loss were suspected*" (emphasis supplied)).

items on the "Personal Property Inventory" filled out by the Knights following the loss; and the suspicious number of items that the Knights alleged that they had purchased after their 2008 bankruptcy proceeding.[61]

### a.   Kelli Knight's behavior

Jewel Stubbs testified that Kelli Knight "was the most aggressive person that I have dealt with in my 30 years [of experience in working with victims of fires]."[62] Stubbs stated that, even though fire victims typically are in shock, Kelli Knight was immediately aggressive about obtaining money.  As a result, EMCASCO advanced substantially more than it normally does during the course of a claim investigation.[63]

### b.   Misrepresentations

Stubbs also testified that there were multiple misrepresentations in the "Personal Property Inventory" form that the Knights submitted to EMCASCO following the fire loss.  For example, the replacement value of the items listed on the inventory were all even dollar amounts, and "very few things are even dollars out there."[64]  Stubbs also objected to the Knights' claim of three "pageant dresses" for $1,200, as EMCASCO later found that they had purchased the dresses on eBay for

---

[61] *See* doc. no. 23-4 (Plaintiff's Exhibit "O" (Deposition Testimony of Jewel E. Stubbs)), at 22–33.

[62] *Id.* at 25 (alteration supplied).

[63] *Id.* at 23.

[64] *Id.* at 39.

only $400.[65]  Moreover, the Knights declared the replacement cost of a tanning bed to be $2,500, but Kelli Knight later admitted that she had paid $600 or $700 for the item on Craigslist.[66]  Finally, the Knights' Personal Property Inventory claimed in excess of $12,000 for furniture bought at Clement Hill Furniture in Muscle Shoals, Alabama, on dates ranging from eight months to two years prior to the December, 2011 fire, *even though that particular furniture store burned on October 22, 2009, and did not reopen*.[67]  Even so, the Knights contend:

> [T]here were purchases from Clement Hill Furniture that took place in April of 2009 and May of 2009 just 2 1/2 years prior to the Knights' fire loss found in the bank records provided by the Knights to counsel for EMCASCO prior to their Examination Under Oath.  In addition, the photos in the claim file from a prior loss just months prior to the subject loss provide documented evidence of many of the items claimed.[68]

### c.    Items allegedly purchased following 2008 Bankruptcy

Stubbs also testified that EMCASCO was concerned by the fact that the Knights' 2008 bankruptcy "showed that they had very little, and in this space of two

---

[65] *See id.* at 40–41; doc. no. 23-1 (Plaintiff's Exhibit "L" (Examination Under Oath of Kelli Knight)), at 68–69.

[66] *See* doc. no. 23-1 (Plaintiff's Exhibit "L" (Examination Under Oath of Kelli Knight)), at 72; doc. no. 23-4 (Plaintiff's Exhibit "O" (Deposition Testimony of Jewel E. Stubbs)), at 41–42. Though Stubbs objected that Kelli Knight had not researched the item online, "to see what it would go for," Stubbs subsequently admitted that she did not "understand how [Craigslist] works." *See* doc. no. 23-4 (Plaintiff's Exhibit "O" (Deposition Testimony of Jewel E. Stubbs)), at 42.

[67] *See* doc. no. 20-1 (Undisputed Statement of Facts), at ECF 25–26.

[68] Doc. no. 35 (Knights' Response in Opposition to Motion for Summary Judgment), at 33 (citing doc. no. 21-3 (Plaintiff's Exhibit "D", Part 1 (Evers & Associates First Report & Exhibits), at 38–54) (alteration supplied).

years had purchased over a hundred thousand dollars in personal property, and their economic situation simply did not lend itself to that."[69]  In fact, the Knights' income tax returns for the tax years following their 2008 bankruptcy showed total taxable income in the amount of $162,000, but the Knights claimed that $129,964.37 in personal property was lost in the fire.[70]

### 3.    Discrepancies between the Knights' 2008 bankruptcy schedule and their 2011 personal property inventory

EMCASCO alleges that there are several inconsistencies between the property claimed on the bankruptcy schedule submitted by the Knights in 2008, and the personal property inventory filed pursuant to their 2011 fire loss claim.

Christopher and Kelli Knight declared on their Bankruptcy Schedule "B"[71] that they owned the following personal property on March 28, 2008:  "Household goods and furnishings, including audio, video, and computer equipment" valued at $350; wearing apparel valued at $200; furs and jewelry valued at $50; and a computer valued at $50.[72]  Those valuations were accepted and the Knights' debts were

---

[69] *Id.* at 32–33.

[70] *See* doc. no. 20-1 (Undisputed Statement of Facts) ¶ 78.

[71] *E.g.,* doc. no. 21-4 (Plaintiff's Exhibit "D", Part 2 (March 28, 2008 Voluntary Petition for Bankruptcy)), at 55–109 (entire petition); *id.* at 65-67 (Bankruptcy Schedule B).

[72] *Id.* at 65, 67.  The Knights also claimed ownership of a "1991 Ford F250 Truck," "1998 Honda Motorcycle," and a "2001 Pontiac Aztek," valued at a total worth of $4,700.  *Id.* at 67.

discharged on August 8, 2008.[73]

Three years and nine months later, however, the Knights listed more than 600 items on the Personal Property Inventory filed in connection with their December 4, 2011 fire loss.  Ten of the items listed were described as having been owned *prior to bankruptcy*: *i.e.*,

- 3 Quilts, $150, age 4 years [p. 8, line 15];

- Stereo, $250, age 5 years [p. 10, line 15];

- Small Dresser, $200, age 8 years [p. 27, line 3];

- Punch Bowl Set, $55, age 7 years [p. 27, line 5];

- Curio Cabinet, $275, age 6 years [p. 30, line 17];

- Indoor Halloween Decor, $95, age 6 years [p. 32, line 10];

- Large Halloween Village, $220, age 4 years [p. 32, line 12];

- Valentine Village, $215, age 4 years [p. 33, line 1];

- 20 Piece Knife Set, $95, 4 years [p. 35, line 9]; and,

- Crystal Fruit Bowl, $140, 5 years [p.35, line 4].[74]

The Knights also claimed a Glock 22 handgun with a replacement value of $710, and two BB guns with a replacement value of $70, that they contend were

---

[73] *See* doc. no. 24-6 (Plaintiff's Exhibit "T" (Discharge of Debtor, *In re Christopher and Kelli Knight*, Case No. 08-80936-JAC7, (U.S. Bankr. Ct., N.D. Ala., Aug. 8, 2008))).

[74] Doc. no. 20-1 (Undisputed Statement of Facts) ¶ 68 (bracketed text in original) (citing doc. nos. 24 and 24-1 (Plaintiff's Exhibit "Q," Parts 1 and 2 (Personal Property Inventory))).

purchased *prior to 2008*, but neither of those items had been disclosed on their bankruptcy schedule.[75]  In addition, the Knights listed four pieces of jewelry as having been owned prior to their bankruptcy:

- Bridal Set Rings - $5,500 [p. 5, line 18];

- Titanium Wedding Band - $349 [p.8, line 16];

- Tennis Bracelet - $200 [p. 4, line 3]; and

- 3 Rings - $350 [p.4, line 4].[76]

The only items of jewelry disclosed on the Knights' bankruptcy schedule were "wedding bands," and rather than claiming their worth as $5,500, the Knights stated that the rings were worth only a paltry $50.[77]  This discrepancy, and some of the *numerous* other discrepancies between the Knights' 2008 bankruptcy schedule and their 2011 Personal Property Inventory, were addressed in Kelli Knight's second deposition.  The following colloquy is an example:

---

[75] *Compare* doc. no. 24 (Plaintiff's Exhibit "Q," Part 1 (Personal Property Inventory)), at 8, 10, *with* doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 65–67 (Schedule B - Personal Property).

[76] Doc. no. 20-1 (Undisputed Statement of Facts)*, at* ECF 20 (ellipses supplied, bracketed text in original).  EMCASCO also stated that a "Men's Wedding Band" valued at $299 by the Knights preceded the Knights' bankruptcy, but that item was listed by the Knights on their Personal Property Inventory form as having been obtained in 2009, and, thus, postdates the filing of the Knights' bankruptcy schedule. *See* doc. no. 24 (Plaintiff's Exhibit "Q," Part 1 (Personal Property Inventory)), at 10; doc. no. 20-1 (Undisputed Statement of Facts) ¶ 59.

[77] *Compare* doc. no. 24 (Plaintiff's Exhibit "Q," Part 1 (Personal Property Inventory)), at 5, 10, *with* doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 65 (Schedule B - Personal Property).

23

Q.      I know we went over this a pretty good bit during your examination under oath, but when the two of you filed this Chapter 7 bankruptcy in 2008, did you give accurate information to the people who filed the bankruptcy as to your — the items in your estate; in other words, what you owned?

A.      When we did the bankruptcy, they — I mean, I told them we had clothes, but we didn't have any major furniture or anything. She pretty much did what she wanted to do as far as what they — what they write the clothes and stuff amount up. But yeah, I mean, we just had our clothes and we had some mattresses and my rings and that's — a few dishes. I mean, that was pretty much the extent of what we had.

. . . .

Q.      Okay. So the determination to put down that your wedding rings were worth $50 —

A.      That's what she determined. She said that you put a yard sale cost and that's all somebody would pay at a yard sale for a set of rings.

Q.      Okay. Really? You don't think that's true, do you?

A.      I mean, I don't know what yard sale costs are for a ring. I mean, if I was going to a yard sale, I wouldn't even buy jewelry, but —

Q.      Well, that certainly wouldn't be the place to sell one.

A.      No, but she said that's how the Court determines what they do as far as prices.

Q.      Okay. Now, who told you that?

A.      Jennifer, which is the — Tom McCutcheon's[78] assistant

_____

[78] Tom McCutcheon was the Knights' bankruptcy attorney. *See* doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 56–57.

... 

that does his bankruptcy.

Q.    Okay.  Now, the part at the bottom where you say I declare under penalty of perjury the information in this petition is true and correct, did you review the information and sign it as being true and correct?

A.    I signed it and —

Q.    And did you intend on the bankruptcy court to rely on this information to tell the creditors that there wasn't anything there for them to get for you to pay what you owed?

A.    I mean, there really wasn't anything there for them to get.

Q.    Okay.  But now, these wedding rings you're telling EMC they're worth $5,500.

A.    You asked for the replacement cost on them.  To replace them, that's what it would cost.  That's not what somebody would sell ten years later to somebody.  I mean —

Q.    Well, do you think jewelry depreciates, diamonds and gold?

A.    I have no idea.

Q.    Okay.  But you signed that telling the bankruptcy court that your rings were $50, is what they were worth?

A.    They said that they went by yard sale value on a bankruptcy and they said — I mean, I buy — I've bought a lot of nice things at yard sales before for friends and family.  I bought my kids nice clothes.  I've bought a really nice dress for $0.25.  So if you want to use it as an example to that, you know, that sounded sufficient to me.[79]

---

[79] Doc. no. 24-4 (Plaintiff's Exhibit "S," Part 1 (Second Deposition of Kelli Knight)), at 199–202 (footnote supplied).

Taken together, these factors caused EMCASCO to formally deny the Knights' December 4, 2011 fire loss claim on May 16, 2012, with the filing of the declaratory judgment complaint in this action.[80]

**E. Current Procedural Posture of the Case**

EMCASCO's complaint for declaratory judgment seeks: a declaration that the Knights breached their insurance contract or, in the alternative, that a valid contract never existed; a declaration that no coverage existed under the EMCASCO policy for the submitted claim; a jury determination of the true value of the Knights' insurance claim, based upon the evidence presented at trial; and, a court order for the Knights to reimburse EMCASCO for all money the company was forced to pay as a result of the Knights' alleged breach of contract.[81]

In response, the Knights filed a counterclaim and, later, on August 2, 2012, an amended counterclaim. The amended counterclaim asserts breach of contract and bad faith claims against EMCASCO for refusing to pay their insurance claim (Counts One and Two), and claims for "Negligence, Wantonness and/or Wilfulness," "Fraudulent Misrepresentation," and "Fraudulent Suppression" (Counts Three, Four, and Five) for EMCASCO's failure to document the Knights' mortgage with Regions on their

[80] *See* doc. no. 1 (Complaint for Declaratory Judgment); *see also* doc. no. 35 (Knights' Response in Opposition to Motion for Summary Judgment), at 21 (citing doc. no. 21-2 (Plaintiff's Exhibit "C" (Deposition of Charles Highland Herrold)), at 48).

[81] *See generally* doc. no. 1 (Complaint for Declaratory Judgment), at 8–14.

insurance policy.[82]

EMCASCO alleges that the following events occurred shortly after the Knights' amended counterclaim was filed:

108.   In August 2012, after confirming the agent's many errors & omissions in taking the Knights' application[,] EMCASCO sought legal advice regarding its obligations under Alabama law to an unnamed mortgagee under these circumstances; and, Herrold and Stubbs then made the decision to treat Regions as if it had been a named mortgagee on the Knights' policy.  [Exhibit C, pp. 22-24]

109.   Stubbs sent claim forms and instructions to Regions by Certified Mail, Return Receipt Requested and regular U.S. mail on August 10, 2012, inviting Regions to make its claim.  [Exhibit O, p. 99, lines 6-23 & Exhibit Y]

110.   Regions did not submit a claim in response to EMCASCO's August 10, 2012 letter; yet, Stubbs continued efforts to solicit a claim from Regions.  [Exhibit O, p. 121-123 & Exhibit Y]

. . . .

118.   Regions subsequently submitted a Sworn Proof of Loss dated February 28, 2013, making claim for $119,394.00 from EMCASCO.  [Exhibit Y]

119.   EMCASCO remitted payment to Regions in the amount of $119,394.00 on March 7, 2013. [Exhibit Y][83]

EMCASCO moved for summary judgment on all of the Knights' counterclaims

---

[82] *See* doc. no. 7 (Kelli and Christopher Knight's Amended Counterclaim), at 2–15.

[83] Doc. no. 20-1 (Undisputed Statement of Facts) ¶¶ 108–10, 118–19 (first alteration supplied, all other bracketed text in original).

on May 15, 2013.[84]  EMCASCO contends that all of the Knights' claims are barred

under the principle of "judicial estoppel," arguing that the Personal Property

Inventory submitted to EMCASCO by the Knights as proof of their fire loss is clearly

inconsistent with the inventory submitted by the Knights to the United States

Bankruptcy Court in the Northern District of Alabama on March 28, 2008, pursuant

to their Chapter 7 Bankruptcy filing.[85]

EMCASCO also contends that summary judgment is due to be granted in its

favor on the Knights' breach of contract claim, because the Knights made intentional

misrepresentations in their Personal Property Inventory which both violates the terms

of the insurance contract and renders the contract void under Alabama Code § 27-14-

28.[86]  EMCASCO further contends that the Knights' bad faith claim fails as a matter

of law, because EMCASCO conducted a thorough investigation of the Knights'

insurance claim, and had at least an arguable reason for denying the claim.[87]

EMCASCO also argues that the Knights' misrepresentation and fraud claims flowing

from the failure to name Regions as a mortgagee (i.e., loss payee) on the Knights'

Homeowner's Insurance Policy fail as a matter of law because the Knights did not

---

[84] *See* doc. no. 20 (Plaintiff, EMCASCO Insurance Company's Motion for Summary Judgment).

[85] *See* doc. no. 20-1 (Undisputed Statement of Facts), at ECF 20.

[86] *See id.* at ECF 24.

[87] *See id.* at ECF 28–38.

suffer damages as a result of the failure.

### III. JUDICIAL ESTOPPEL

EMCASCO contends that the Knights should be judicially estopped from asserting any counterclaims based upon the personal property inventory they submitted as part of their fire loss claim. EMCASCO argues that the doctrine of judicial estoppel should apply because the values the Knights assigned to personal property during their 2008 bankruptcy proceeding are much lower than the values they assigned to the same personal property as part of their 2011 fire loss claim.

Judicial estoppel is an equitable doctrine that prevents a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (quoting 18 James Wm. Moore *et al.*, *Moore's Federal Practice* § 134.30, at 134–62 (3d ed. 2000)). The purpose of the doctrine is "to protect the integrity of the judicial process, by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (alteration supplied) (internal quotation marks omitted) (quoting *Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595, 598 (6th Cir. 1982), and *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)).

For diversity cases in the Eleventh Circuit, "the application of the doctrine of

judicial estoppel is governed by state law." *Original Appalachian Artworks, Inc. v. S. Diamond Associates, Inc.*, 44 F.3d 925, 930 (11th Cir. 1995). In Alabama, "there is no general formulation of principle dictating when the doctrine of judicial estoppel applies; such a decision is left to the court's discretion, enlightened by several informative factors gleaned from precedent of this Court and the United States Supreme Court in the landmark case of *New Hampshire v. Maine*." *Hughes v. Mitchell Co., Inc.*, 49 So. 3d 192, 203 (Ala. 2010) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)).

The informative factors set out by the United States Supreme Court and embraced by the Alabama Supreme Court dictate that, for judicial estoppel to apply,

> (1) "a party's later position must be 'clearly inconsistent' with its earlier position"; (2) the party must have been successful in the prior proceeding so that "judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or second court was misled' "; and (3) the party seeking to assert an inconsistent position must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Ex Parte First Alabama Bank*, 883 So. 2d 1236, 1244–45 (Ala. 2003) (internal citations omitted) (quoting *New Hampshire*, 532 U.S. at 750–51).

## A.   Personal Property Not Disclosed to the Bankruptcy Court

During their 2008 bankruptcy proceeding, the Knights represented to the court

that they did not own any firearms.[88]  In their 2011 fire loss claim, they claimed the loss of one handgun and two BB guns, with a total value of $780, all purchased *before* the bankruptcy proceeding.[89]  These two positions are clearly inconsistent and thus satisfy the first *New Hampshire* factor.  *See First Alabama*, 883 So. 2d at 1245 (holding that a plaintiff's denial of the existence of a cash reserve to a bankruptcy court was "completely inconsistent" with his later negligence claim based on that cash reserve).

With regard to the second factor, the Knights were successful in the bankruptcy proceeding, in that the court accepted the assigned values and discharged their debts.[90]  Allowing the Knights now to assert a claim based upon the firearms would reward them for misleading the bankruptcy court.  *See First Alabama*, 883 So. 2d at 1245.

Third, if the Knights were permitted to claim the loss of the firearms, they would gain an unfair advantage over — and impose an unfair detriment on — EMCASCO.  *See First Alabama*, 883 So. 2d at 1245 (holding that allowing a plaintiff to pursue a claim based on assets he concealed from one court "satisfies both

---

[88] Doc. no. 21-4 (Plaintiff's Exhibit "D", Part 2 (Voluntary Petition for Bankruptcy)), at 65–67 (Schedule B - Personal Property).

[89] Doc. no. 24 (Plaintiff's Exhibit "Q," Part 1 (Personal Property Inventory)), at 8, 10.

[90] *See* doc. no. 22-6 (Plaintiff's Exhibit "J" (SIU Investigative Report #1)), at 1; *see also* doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 55–109.

alternative prongs set forth under the third factor of *New Hampshire v. Maine* — he

would derive an unfair advantage *and* impose an unfair detriment on the [defendant]

if not estopped." (emphasis in original) (alteration supplied)).

It would be unfair to allow the Knights to conceal assets from one court and

then assert claims in this court based upon those assets.  "[T]o protect the integrity of

the judicial process," the Knights will be estopped from basing any counterclaims

upon their ownership of the firearms.  *New Hampshire,* 532 U.S. at 749 (alteration

supplied).

**B**.   **Personal Property Disclosed to the Bankruptcy Court**

The question of whether the Knights' assignment of low values to personal

property in their bankruptcy schedule should estop them from assigning higher values

to the same personal property in their claim against EMCASCO is closer than the

issue of the firearms.

The analysis is complicated by the fact that the different forms completed by

the Knights in both fora solicited different types of values.  For example, the Knights'

bankruptcy petition required them to provide the "Current Value of Debtor's Interest"

in the property for each item — that is, *the resale value* of the used goods.[91]   In

contrast, the insurance claim forms provided by EMCASCO required them to provide

---

[91]   Doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at
65–67 (Schedule B - Personal Property).

the "Current Replacement Cost" for each item — that is, how much it would cost the Knights to *purchase* a replacement for each item.[92]

Although there are inherent inconsistencies in these types of valuations, plaintiffs must not be allowed to manipulate the valuations so as to "make a mockery of the judicial system." *Burnes v. Pemco Aeroplex, Inc.,* 291 F.3d 1282, 1287 (11th Cir. 2002). The question is whether the differences in value rise to the level of being "clearly inconsistent." *First Alabama,* 883 So. 2d at 1244.

In their bankruptcy schedule, the Knights valued their "Furs and jewelry" at $50.[93] In their insurance claim, they valued jewelry obtained *before* the bankruptcy at $6,148.[94] The court finds that this disparity, where the value claimed to this court is more than *one hundred times* the value claimed to the bankruptcy court, is sufficiently egregious as to constitute a clear inconsistency. The court also finds that, if it were to accept the Knights' inflated valuation, it would create the perception that the bankruptcy court was deceived by the Knights as to the value of the jewelry.

The court is aware of two federal district court cases reaching a different conclusion on similar facts. *See State Farm Fire and Casualty Co. v. Billingsley,* No.

---

[92] Doc. nos. 24 and 24-1 (Plaintiff's Exhibit "Q," Parts 1 & 2 (Personal Property Inventory)) at 1–39.

[93] Doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 65 (Schedule B - Personal Property).

[94] Doc. no. 24 (Plaintiff's Exhibit "Q," Part 1 (Personal Property Inventory)), at 5, 10.

09-0267-KD-C, 2010 WL 1511560 (S.D. Ala. Apr. 14, 2010) (Dubose, J.); *Hoffman v. Foremost Signature Insurance Co.*, 989 F. Supp. 2d 1070 (D. Or. 2013) (McShane, J.). In *Billingsley*, the court found that "the current value of personal property, versus the replacement cost of personal property, are distinct values" and, therefore, the plaintiff's positions were not "*necessarily* inconsistent positions." *Billingsley*, 2010 WL 1511560 at *9 (internal quotation marks omitted, emphasis supplied). *Billingsley* is easily distinguished from the present case. First, the court in *Billingsley* did not apply Alabama law, as required by the Eleventh Circuit in *Original Appalachian Artworks*. *See id.* at *9. Instead, the court applied factors that are inconsistent with the factors embraced by the Alabama Supreme Court. *See id.* (applying two factors from *Burnes v. Pemco Aeroplex*, 291 F.3d at 1287). Second, the *Billingsley* court found that the positions taken by the plaintiffs were not *necessarily* inconsistent. *Id.* Alabama law, in contrast, requires a court to decide whether the positions are *clearly* inconsistent. *First Alabama*, 883 So. 2d at 1244. If the law required that the values be *necessarily* inconsistent, then no difference in values, no matter how egregious, could satisfy the standard, as long as the *types* of values were different.

In *Hoffman*, a plaintiff who claimed to a bankruptcy court that her personal property was worth $5,000 was not estopped from claiming in an insurance claim that the property was worth more than $60,000. 989 F. Supp. 2d at 1079. That case is

34

distinguishable for two reasons.   First, *Hoffman* relied heavily on "additional leniency" provided to the plaintiff because she appeared *pro se* in the bankruptcy proceeding, where her valuation mistakes were "inadvertent."   *Id.* at 1078.   The Knights, in contrast, were represented by counsel during their bankruptcy proceeding and are not entitled to such leniency.[95]   Second, *Hoffman* involved a dispute about the value of the property at the time of the bankruptcy proceeding, which the court found to be a "genuine issue of material fact as to the 'actual' value of [the] property."   *Id.* at 1079 (alteration supplied).   Here, there is no such dispute between the Knights and EMCASCO about the value of the property at the time of the bankruptcy proceeding.[96]

The Knights argue that EMCASCO's collection of premiums from the Knights on a policy with a personal property policy limit of $114,388 should foreclose any estoppel claims.   The Knights argue that judicial estoppel here would grant EMCASCO a "windfall," as EMCASCO has collected premiums based upon that policy limit and would unfairly profit if the application of judicial estoppel would significantly reduce the value of their personal property claim.[97]   The Knights cite

---

[95] Doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 56.

[96] *Compare* Doc. no. 20-1 (Undisputed Statement of Facts) ¶¶ 58–75, *with* doc. no. 35 (Knights' Response in Opposition to Motion for Summary Judgment), at 3.

[97] Doc. no. 35 (Knights' Response in Opposition to Motion for Summary Judgment), at 30.

*Middleton v. Caterpillar Industries, Inc.*, 979 So. 2d 53, 60–61 (Ala. 2007), to support their argument.   In *Middleton*, the "windfall" was "the dismissal of [plaintiff's] potentially meritorious claim." *Id.* at 64 (alteration supplied).   Here, the application of judicial estoppel would not result in the dismissal of a claim.   More importantly, windfall to EMCASCO is of less concern when the Knights have concealed assets from a court of law.[98]   Further, a $6,098 reduction of the claim is not a windfall to EMCASCO, as the personal property portion of the insurance claim totals $129,964.37.

Accordingly, the Knights are estopped from claiming more than $50 for the value of all jewelry owned at the time of the bankruptcy proceeding.

The Knights valued their remaining household goods in the bankruptcy schedule at $550: $350 for household goods and furnishings, and $200 for clothing.[99] In their insurance claim, however, the Knights claimed household items purchased before the bankruptcy at a total value of $1,695.[100]   Considering the inherent differences in the valuations used in bankruptcy proceedings and in insurance claims,

---

[98] The Knights entered only "Wedding Bands" in the "Furs and jewelry" portion of their bankruptcy schedule, and did not include a tennis bracelet and three other valuable rings. *Compare* Doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 65 (Schedule B - Personal Property), *with* doc. no. 20-1 (Undisputed Statement of Facts), at ¶¶ 58–75.

[99] Doc. no. 21-4 (Plaintiff's Exhibit "D," Part 2 (Voluntary Petition for Bankruptcy)), at 65 (Schedule B - Personal Property).

[100] Doc. no. 20-1 (Undisputed Statement of Facts) ¶ 68 (citing doc. nos. 24 and 24-1 (Plaintiff's Exhibit "Q," Parts 1 and 2 (Personal Property Inventory))).

*see Billingsley*, 2010 WL 1511560, at *9, and considering that the disparity here is not egregious, this court finds that the two positions taken by the Knights regarding household goods and clothing are not clearly inconsistent.  Accordingly, the Knights are not estopped from asserting claims based upon the $1,695 value of the ten household items purchased before the 2008 bankruptcy proceeding.

EMCASCO's motion for summary judgment on the ground of judicial estoppel is due to be denied.

## IV.  BREACH OF CONTRACT

EMCASCO also contends that summary judgment is due to be granted on the Knights' breach of contract counterclaim because the Knights:  "(1) failed to provide truthful information in the claim submitted to EMCASCO in violation of the Concealment or Fraud policy exclusion; [and] (2) provided material misrepresentations to EMCASCO with the actual intent to deceive EMCASCO as to a matter material to the insured's rights under the policy in violation of [Alabama Code] § 27-14-28."[101]

The policy issued by EMCASCO contains a concealment or fraud provision that provides:

### Q.    Concealment or Fraud

---

[101] Doc. no. 20-1 (Undisputed Statement of Facts), at ECF 28 (alterations supplied).

We provide coverage to no "insureds" under this policy if, whether
before or after a loss, an "insured" has:

    1.      Intentionally concealed or misrepresented any material fact
             or circumstance;

    2.      Engaged in fraudulent conduct; or

    3.      Made false statements;

relating to this insurance.[102]

Although only one of the above exclusions explicitly includes intentional
conduct, the entire provision is circumscribed by Alabama Code § 27-14-28 (1975),
which provides: "No misrepresentation in any Proof of Loss under any insurance
policy shall defeat or void the policy *unless such misrepresentation is made with
actual intent to deceive as to a matter material to the insured's rights under the
policy*." Ala. Code. § 27-14-28 (emphasis supplied). "[A]ll insurance contracts must
be read to include this statutory expression of public policy." *Auto Club Family
Insurance Co. v. Mullins*, No. 5:11-CV-1451-AKK, 2012 WL 6043652, at *7 (N.D.
Ala. Nov. 29, 2012) (Kallon, J.) (alteration supplied) (citing *Ex parte State Farm and
Casualty Co.*, 523 So. 2d 119, 120–21 (Ala. 1988)). Thus, for summary judgment to
be granted on either ground argued by EMCASCO, this court must find, as a matter
of law, that the Knights made misrepresentations with an actual intent to deceive.

---

[102] Doc. no. 1-1 (Plaintiff's Exhibit "A" (EMCASCO Insurance Company Policy Number
74S-44-04-12)), at ECF 21-22.

Alabama law provides, however, that a determination of a party's intent to deceive is a question more appropriately reserved for the jury. *See, e.g.*, *Murphy v. Droke*, 688 So. 2d 513, 517 (Ala. 1995) (holding that even "[w]here the plaintiff presents substantial evidence that the defendant had an intent to deceive, it is for the jury to decide whether the defendant actually had such an intent." (alteration supplied)); *State Farm Mutual Automotive Insurance Co. v. Borden*, 371 So. 2d 28, 30 (Ala. 1979) ("Whether specific conduct constitutes an intent to deceive is a jury question.") (citing *Metropolitan Life Insurance Co. v. James*, 191 So. 352 (Ala. 1939). Alabama law clearly provides that a determination of a party's intent to deceive is a question more appropriately reserved for the jury. *Murphy*, 688 So. 2d at 517.

Further, there remain genuine issues of material fact as to whether the misrepresentations were intentional. The Knights corrected some of their misrepresentations while their EMCASCO claim was still being decided, which supports the Knights' assertion that summary judgment is not appropriate on this ground. *See Hillery v. Allstate Indemnity Co.*, 705 F. Supp. 2d 1343, 1360 (S.D. Ala. 2010) (Steele, J.) (finding that a reasonable fact-finder could conclude, based on evidence that the insured party corrected inaccuracies while the case was still open, that misrepresentations were not intentional).

39

Accordingly, EMCASCO's motion for summary judgment on the Knights' counterclaim for breach of contract is due to be denied.

## V.  **BAD FAITH**

EMCASCO also moved for summary judgment on Count Two of the Knights' counterclaim:  that is, the allegation that EMCASCO breached its duty of good faith and fair dealing under the terms of the insurance contract by "refusing to pay benefits set out in the policy, where there existed no lawful basis for their refusal coupled with their actual knowledge of the absence of any lawful basis" (*i.e.* a "normal bad faith claim"), and by "intentionally failing to determine whether there was an arguable reason or lawful basis for denying payment of full benefits under the policy" (*i.e.*, an "abnormal bad faith claim").[103]

After this suit was filed, the Alabama Supreme Court held that "there is only *one* tort of bad-faith refusal to pay a claim, not two 'types' of bad faith or two separate torts." *State Farm Fire and Casualty Co. v. Brechbill*, No. 1111117, 2013 WL 5394444, at *8 (Ala. Sept. 27, 2013) (emphasis in original).  The Court went on:

> We have repeatedly held that the tort of bad-faith refusal to pay a claim has four elements — (a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer's knowledge of such absence — with a conditional fifth element:  "(e) if the intentional failure to determine the existence of a lawful basis is

---

[103] Doc. no. 7 (Kelli and Christopher Knight's Amended Counterclaim), at 5–6.

relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *Bowen*, 417 So. 2d at 183.  Thus, for the tort of bad-faith refusal to pay, "[r]equirements (a) through (d) represent the 'normal' case.  Requirement (e) represents the 'abnormal' case." *Employees' Benefit Assoc. v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998).  But the tort has always been *one*.

*Brechbill*, 2013 WL 5394444, at *9 (citation to *Grissett* supplied) (alteration in original).

Thus, this court will address the alleged torts of bad faith as one claim.  In that regard, the Alabama Supreme Court has explained that:

> The Plaintiff asserting a bad-faith claim bears a heavy burden.  To establish a *prima facie* case of bad-faith refusal to pay an insurance claim, a plaintiff must show that the insurer's decision not to pay was without a[ ] ground for dispute; in other words, the plaintiff must demonstrate that the insurer had no legal or factual defense to the claim.  The insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim.  A finding of bad faith based upon rejection of an insurers [sic] legal argument should be reserved for extreme cases.  The right of an insurer to deny a claim on any arguable legal issue is to be as zealously guarded as is its right to decline benefits on any debatable issue of fact, the test of reasonableness being the same.

*Shelter Mutual Insurance Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001) (internal citations and quotation marks omitted, alterations in original).  In addition, for plaintiffs to make out a *prima facie* case of bad faith refusal to pay a valid insurance claim, they must show that they are "entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law."

*National Savings Life Insurance Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

Because this court already has found genuine issues of material fact as to the breach of contract counterclaim, the Knights' counterclaim of bad faith fails under the directed verdict standard.  *See, e.g.*, *State Farm Fire & Casualty Co. v. Balmer*, 891 F.2d 874, 876–77 (11th Cir. 1990) (holding that because conflicting evidence existed as to whether an insurance contract was invalid on grounds of arson and misrepresentation, the directed verdict standard required that the insured's claim for normal bad faith must necessarily fail).  There are, nevertheless, exceptions to the directed verdict standard.  *See Thomas v. Principal Financial Group*, 566 So. 2d 735 (Ala. 1990); *State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 306 (Ala. 1999).  The Alabama Supreme Court has held that the directed verdict standard does not apply when the plaintiff produces

> substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.

*Slade*, 747 So. 2d at 306–07.  The Knights here allege only the third situation — *i.e.*, that EMCASCO created its own debatable reason for denying the Knights' claim.

An insurer creates its own debatable reason for denying a claim "when the very

existence of the sole factual basis for denial of the claim is itself subject to dispute." *Pyun v. Paul Revere Life Insurance Co.*, 768 F. Supp. 2d 1157, 1173 (N.D. Ala. 2011) (Proctor, J.) (cited favorably in *Brechbill*, 2013 WL 5394444 at *11).  For example, summary judgment is not appropriate when an insurer relies on a statement that the insured denies making. *Id.* (citing *Jones v. Alabama Farm Bureau Mutual Casualty Co.*, 507 So. 2d 396, 400–01 (Ala. 1987)).  That is a very limited exception, *see Pyun*, 768 F. Supp. 2d at 1173, and it is not applicable here.

One of EMCASCO's stated reasons for denying the Knights' claim is that the Knights made material misrepresentations to EMCASCO.[104]  It is true that the intentionality of the Knights' misrepresentations is "in dispute,"[105] but "the very existence" of those misrepresentations is not in dispute.  *Pyun*, 768 F. Supp. 2d at 1173.  The Knights do not deny that they made misrepresentations.[106]  The character of the misrepresentations may be in dispute, but their *very existence* is not.  Therefore, this limited exception to the directed verdict standard does not apply.

"Bad faith . . . is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through

---

[104] Doc. 1 (EMCASCO's Complaint), at 9, ¶ 33.

[105] *See supra* Section III (finding that there are genuine issues of material fact as to the intentionality of the misrepresentations).

[106] *See* doc. no. 35 (Knights' Response in Opposition to Motion for Summary Judgment), at 32–34.

43

some motive of self-interest or ill will." *Singleton v. State Farm Fire and Casualty Co.*, 928 So. 2d 280, 283 (Ala. 2005) (alteration in original) (internal quotation marks omitted).  Plaintiffs must prove that the defendant's actions "rise to the level of bad faith, dishonesty, self-interest, or ill will inherent in bad-faith conduct." *Brechbill*, 2013 WL 5394444 at *11.

The Knights have not provided evidence that EMCASCO acted with a dishonest purpose when it denied their claim, nor have they provided evidence that EMCASCO breached a duty of good faith.  Instead, the evidence shows, and the Knights do not dispute,[107] that EMCASCO conducted an extensive investigation of their claim.  EMCASCO supports its denial of the claim with the following undisputed facts, *inter alia*, discovered during its investigation: the fire was incendiary;[108] the Knights were across the street when the fire started;[109] they misrepresented the values of pageant dresses and a tanning bed;[110] they concealed assets from a court of law;[111] they provided inconsistent sworn testimony as to the

[107] Doc. no. 35 (Knights' Response in Opposition to Motion for Summary Judgment), at 41 ("It is not the failure to investigate that supports the Knights' abnormal bad faith claim").

[108] Doc. no. 20-1 (Undisputed Statement of Facts) ¶ 38 (alteration supplied) (citing doc. no. 22-6 (Plaintiff's Exhibit "J" (SIU Investigation Report #1)), at 1–2).

[109] *See, e.g.*, doc. no. 22-2 (Plaintiff's Exhibit "G" (Examination Under Oath of Chris Knight)), at 14, 37, 58.

[110] *See* doc. no. 23-4 (Plaintiff's Exhibit "O" (Deposition Testimony of Jewel E. Stubbs)), at 40–41; doc. no. 23-1 (Plaintiff's Exhibit "L" (Examination Under Oath of Kelli Knight)), at 68–69.

[111] *See supra* Section III.

44

origin of furniture;[112] and they had twice previously collected insurance payments for fire damage.[113]

A reasonable fact-finder later may find that the Knights did not start or procure the fire, and that their misrepresentations were not intentional. Regardless, considering EMCASCO's extensive investigations and the substantial evidence supporting its reasons for denial, the denial cannot rise to the level of bad faith.

Accordingly, EMCASCO's motion for summary judgment on Count Two of the Knights' counterclaim is due to be granted.

## VI. NEGLIGENCE, WANTONNESS, AND FRAUD

Counts Three, Four, and Five of the Knights' counterclaim are based on identical allegations, which read as follows:

> 2. At the time of application, underwriting, issuing and prior claim handling concerning the policy made the basis of this lawsuit, EMC Insurance was aware through its employee(s), agent(s) and/or representative(s) that the Knights had a mortgage on their property with Regions Bank.

> 3. For the purposes of closing, a binder was issued by EMC Insurance's acting agent whereby Regions Bank was listed as a mortgagee with its loan number included.

> 4. Despite this information being disclosed to EMC Insurance in the application process and the issuing of such binder, Regions Bank

---

[112] *See* doc. no. 20-1 (Undisputed Statement of Facts), at ECF 25–26.

[113] *See* doc. no. 22 (Plaintiff's Exhibit "E" (Southeastern Origin & Cause Reports)), at 4, 6.

was not listed as a mortgagee on the policy that was issued.

     5.    During the adjustment of a prior claim on said policy involving water damage, EMC Insurance employee, Jewel Stubb [*sic*], questioned Kelli Knight about the absence of a mortgagee being listed on the policy for the subject property.  Kelli Knight informed Stubb [*sic*] that a mortgage did exist and that such mortgage had been disclosed at the time of application and binder.  Stubb [*sic*] informed Kelli Knight that she would take care of Regions Bank being properly listed as the mortgagee on the policy.

     6.    The Knights are aware that EMC Insurance sent a prior notice of non-renewal of the subject policy to Regions Bank upon its decision and notification to the Knights.

     7.    The subject policy has a Mortgagee Clause that would obligate EMC Insurance to make payments directly to such mortgagee notwithstanding any defenses and/or claims asserted against the Knights.  EMC Insurance has refused to make payment under the Mortgagee Clause asserting that there was no mortgagee listed on the subject policy.

     8.    EMC Insurance had a duty to properly document the known mortgagee on the Knights' policy . . . .

     9.    As a proximate result of the . . . conduct of EMC Insurance, the Knights suffered damages as previously described herein that are continuing in nature.[114]

The Knights contend that the alleged actions of EMCASCO amounted to "Negligence, Wantonness[,] and/or Wilfulness" (Count Three), "Fraudulent

---

[114] Doc. no. 7 (Kelli and Christopher Knight's Amended Counterclaim), at 7–8 (Count Three) (alterations supplied); *see also id.* at 9–11 (same, asserting Count Four), and 13–14 (same, asserting Count Five).

Misrepresentation" (Count Four), and "Fraudulent Suppression" (Count Five).[115]

EMCASCO moved for summary judgment on those counts, arguing that, among other

reasons, the Knights have not suffered damages as a result of EMCASCO's alleged

failure to include Regions on the policy.

The contract for insurance between EMCASCO and the Knights includes a

mortgage clause that reads:

### K.    Mortgage Clause

**1.**    If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear.  If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

**2.**    If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

**a.**    Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

**b.**    Pays any premium due under this policy on demand if you have neglected to pay the premium; and

**c.**    Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Paragraphs **E.**  Appraisal, **G.**  Suit Against Us and **I.**  Loss Payment under Section **I** — Conditions also apply to the mortgagee.

**3.**    If we decide to cancel or not to renew this policy, the

---

[115] *Id.*

47

mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

      **4.**    If we pay the mortgagee for any loss and deny payment to you:

            **a.**    We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

            **b.**    At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

      **5.**    Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

In order to survive a motion for summary judgment on their negligence, wantonness, and fraud claims, the Knights must show that EMCASCO's actions were the proximate cause of the Knights' alleged injury. *See Bowker v. Willis*, 580 So. 2d 1333, 1334 (Ala. 1991) (holding that the requisite elements for fraud include that the plaintiff "*was damaged as a proximate result of the alleged misrepresentation.*" (emphasis in original)) (quoting *Hilley v. Allstate Insurance Co.*, 562 So. 2d 184 (Ala. 1990)); *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) ("To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) *proximate causation*; and (4) damage or injury." (emphasis supplied, citation omitted)); *id.* (holding that, for wantonness to be actionable, "that act or omission

must proximately cause the injury of which the plaintiff complains").

The Knights argue that they were "absolutely damaged" by EMCASCO's alleged failure to include Regions on the policy, and EMCASCO's resulting delay of payment to Regions.[116]   The Knights provide little evidence showing that EMCASCO's actions proximately caused the damages, however.  They allege that, after the fire, they suffered damages in the form of continued mortgage payments to Regions despite the total loss of the property, late fees (for failure to make timely mortgage payments), and foreclosure (again for failure to make timely mortgage payments).[117]   All of these alleged damages arose from the Knights' duty to make mortgage payments, a duty the Knights apparently believe would have been extinguished had EMCASCO included Regions on the policy and timely paid benefits pursuant to the policy to Regions.

At the core of the Knights' argument is a misunderstanding of section 4 of the mortgage clause, which provides that EMCASCO will be subrogated to the rights of the mortgagee (*i.e.*, Regions) against the mortgagor (*i.e.*, the Knights) upon payment to the mortgagee.[118]   In other words, the Knights would not *necessarily* be freed of

---

[116] Doc. no. 35 (Knights' Response in Opposition to Motion for Summary Judgment), at 48–49.

[117] *Id.*

[118] Doc. no. 1-1 (Plaintiff's Exhibit "A" (EMCASCO Insurance Company Policy Number 74S-44-04-12)), at ECF 21.

their financial obligations under the mortgage, regardless of the applicability of the mortgage clause.  Rather, the party to whom those obligations accrued would (and did) simply shift from Regions to EMCASCO.   Accordingly, EMCASCO's alleged failure did not proximately cause the Knights' injury.

Second, the Knights argue that they suffered damages when Regions force-placed insurance on the property after the fire.  As their only support for this assertion, they cite lines from Mrs. Knight's deposition, which read:

> Q.  Okay.  Since the fire and since the policy has been cancelled, have you received any notice from your mortgage company that they've acquired insurance with anybody else?
>
> A.  Yes.[119]

The Knights omitted these next few lines from their brief to the court, however:

> Q.  Okay.  And who is it with now –
>
> A.  *I don't even know.*
>
> Q.  — a forced placed policy?
>
> A.  *I do not even know.*[120]

The Knights have provided no evidence that Regions force-placed an insurance policy on the property.  Accordingly, the court finds that they did not suffer damages

---

[119] Doc. no. 23 (Defendant's Exhibit "L" (Deposition of Kelli Knight)), at 36.

[120] *Id.* at 37 (emphasis supplied).

from force-placed insurance.

Because EMCASCO's alleged actions did not proximately cause the Knights' alleged damages, summary judgment is due to be granted in favor of EMCASCO on Counts Three, Four, and Five of the Knights' counterclaim.

## VII. CONCLUSION AND ORDERS

In accordance with the foregoing, it is ORDERED, ADJUDGED, and DECREED that EMCASCO's motion for summary judgment be, and the same hereby is, GRANTED in part, and DENIED in part. Counts Two, Three, Four, and Five of the Amended Counterclaim of defendants (and counterclaim-plaintiffs), Christopher and Kelli Knight, are dismissed with prejudice. The motion is DENIED as to Count One, and the case will proceed to trial on the counterclaim-plaintiffs' breach of contract Counterclaim. Even so, it is ORDERED that Christopher and Kelli Knight may not claim damages for the value of firearms and jewelry acquired by them prior to their 2008 Bankruptcy proceedings. Further, even though the prayer of plaintiff, EMCASCO, for a judgment declaring that the company has no obligation under homeowner's insurance policy number 74S-44-04-12 to provide defendants (and counterclaim-plaintiffs), Christopher and Kelli Knight, with coverage for the house fire that occurred on December 4, 2011, at 919 Vista Circle in Tuscumbia, Alabama, is an equitable issue, for decision by this court, the issue will be submitted to the jury

for an advisory verdict.

      **DONE** and **ORDERED** this 7th day of October, 2014, *nunc pro tunc* August 22, 2014.

                        _____

                        United States District Judge